267 F.2d 785
 GARLAND COAL & MINING COMPANY, a corporation; Canadian
Mining Company, a corporation; Sallisaw Stripping Company, a
corporation; and Ernie Young, an individual, d/b/a Cary
Construction Company, Appellants,
v.
Clifton FEW, Appellee.
 No. 6026.
 United States Court of Appeals Tenth Circuit.
 May 27, 1959.
Rehearing Denied June 27, 1959.
 
 Anna B. Otter, Oklahoma City, Okl., and Kelly Brown, Muskogee, Okl. (John R. Couch of Pierce, Mock & Duncan, Oklahoma City, Okl., with them on the brief), for appellants.
 Woodrow H. McConnell and Ranel Hanson, Oklahoma City, Okl., for appellee.
 Before BRATTON, Chief Judge, PICKETT, Circuit Judge, and KNOUS, District Judge.
 PICKETT, Circuit Judge.
 
 
 1
 This action was brought by the owner of a 110 acre farm in Haskell County, Oklahoma, against three corporations and one individual who were jointly engaged in strip coal mining operations on lands adjacent to the plaintiff's property. The plaintiff alleged that the defendants' activities created a continuing nuisance and also caused damages from trespass. Damages were sought for injury to plaintiff's real property, improvements and crops; for loss occasioned when the mining activities necessitated an otherwise unplanned sale of livestock; for personal injury consisting of extreme mental anguish, physical discomfort, inconvenience and annoyance; and for loss the services and companionship of plaintiff's wife and for the necessary expenses of her medical care. The plaintiff also sought punitive damages and a judgment enjoining certain of defendants' activities and requiring the abatement of certain conditions.
 
 
 2
 There was no evidence to sustain the claims with respect to the livestock or the medical expenses and loss of consortium, and the case was submitted to a jury only upon the questions of actual damages for injury to plaintiff's property, punitive damages and damages for inconvenience, annoyance and discomfort of plaintiff. The jury returned a verdict in favor of the plaintiff in the sum of $4,500 actual damages, $3,625 punitive damages, and $500 actual damages for inconvenience, annoyance and discomfort. The verdict for actual damages of $4,500 was reduced by a remittitur to $2,419.51, and judgment in the sum of $6,544.51 was entered against the defendants. The court, concluding that certain of defendants' mining operations created a nuisance, ordered the abatement of those conditions which interfered with natural water courses on lands adjacent to plaintiff's property and enjoined such of the activities as damaged plaintiff in the free use and enjoyment of his land. The principal questions raised on appeal relate to instructions as to damages to plaintiff's property resulting from the alleged nuisance, the right to punitive damages, and abatement of conditions interfering with the natural flow of water.
 
 
 3
 Plaintiff's evidence established that in 1941 he purchased the farm in question, at which time there was limited amount of coal mining activity in the area. A six room house and other buildings were constructed, along with additional improvements, at a total cost of approximately $6,500. In 1951 there was some coal mining activity near plaintiff's property conducted by others than those involved in this action. In October, 1954 the defendants moved heavy machinery onto the property adjoining the plaintiff on the north, and began strip mining operations which, for the purpose of obtaining coal, necessitated the removal of the overburden from the underlying coal deposits. Within a short time the operations were extended to the property adjoining the plaintiff on the east. Throughout the time that the mining activities were being conducted by these defendants, explosives were used to loosen the overburden, which was then removed in long strips and placed in piles called 'spoil banks', next to the pits formed by this removal process. After removal of the coal, these pits were 40 to 50 feet in depth. Plaintiff testified that heavy charges of blasting poweder,[1] some of which were exploded within 85 feet of his house, knocked putty from the windows of the house, caused its floors to sink, its foundation and walls to crack inside and outside, ruined his water well and damaged his outbuildings. He also testified that in addition to the dust caused by the blasting and use of machinery, the existence of the large piles of overburden, with coal dust on top, caused large amounts of dust to be blown onto his property and into his home and buildings; that the spoil banks 20 to 25 feet in height also had the effect of damming serveral natural water courses and diverting water into a single channel, thereby causing portions of his property to be excessively flooded during heavy rainfall, and that the digging of the deep pits created an unnatural drainage situation which caused his orchard to die for lack of water. Plaintiff also testified that the heavy machinery, in removing the overburden and coal, operated a very short distance from his house and property, twenty-four hours a day, and that trucks carrying coal passed within 15 feet of his house, creating additional noise and dust;[2] and that the terrifying noise of the machines so close to the house prevented sleep at night. Plaintiff testified that he complained to the superintendent and other employees and asked that something be done to relieve the condition, but that he obtained no relief.
 
 
 4
 The court instructed the jury that a nuisance results when a person so uses his property as to cause a substantial injury to the property of another, and then stated that 'If the facts show the mining operations were being conducted in such manner as to constitute a private nuisance causing a substantial injury to the property of the plaintiff, then the plaintiff may recover compensation for the injury sustained, and the Constitution of Oklahoma provides that no private property shall be taken or damaged for private use with or without compensation unless by consent of the owner, and in cases of this character, the use need not be of a careless or negligent nature. Even though the defendants might not have been guilty of carelessness or negligence, as would be required in ordinary lawsuits, if in the use of their property along adjacent to the property of plaintiff, in their mining operations, they caused substantial injury to the property of the plaintiff, he has a right under the law to recover as for a private nuisance.' The defendants urge that this instruction is statement of strict liability, or liability without fault, and is an unwarranted interpretation of Article 2, 23 of the Oklahoma Constitution.[3]
 
 
 5
 This case arose in Oklahoma, and, of course, is controlled by Oklahoma law. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. In a long line of decisions the Oklahoma courts have sustained recoveries under conditions and circumstances such as are shown here, without proof of negligence on the port of the defendants. City of Muskogee v. Hancock, 58 Okl. 1, 158 P. 622, L.R.A.1916F, 897; Tibbets & Pleasant v. Bendict, 128 Okl. 106, 261 P. 551; Fairfax Oil Co. v. Bolinger, 186 Okl. 20, 97 P.2d 574; Phillips Petroleum Co. v. Vandergriff, 190 Okl. 280, 122 P.2d 1020; British-American Oil Producing Co. v. McClain, 191 Okl. 41, 126 P.2d 530; Seismograph Service Corp. v. Buchanan, Okl., 316 P.2d 185;[4] Smith v. Yoho, Okl., 324 P.2d 531; Superior Oil Co. v. King, Okl., 324 P.2d 847.
 
 
 6
 While seemingly conceding that the Oklahoma decisions have construed Art. 2, 23 of the Constitution to permit recovery without a showing of negligence in cases of this type, the defendants contend that each of those cases was premised on a tacit determination that the complained-of activity was of an ultrahazardous nature. From this, they urge, it follows that the instruction in this case was erroneous because it authorized recovery, without a finding of negligence, for all damage to the plaintiff and his property, even though some, if not all, of this damage was caused by activity that was not ultrahazardous. Although some of the cited cases arose out of situations which might be classed as ultrahazardous, there is no indication that the Oklahoma courts intended to limit the applicability of the constitutional provision to only such situations. In City of Muskogee v. Hancock, supra, the court held that the use of explosives in a populous area and within a few feet of plaintiff's building subjected the defendant to strict liability for damage caused by vibration and concussion. However, the court was troubled by the decisions in some jurisdictions, to the effect that absolute liability is imposed where the blasting cause physical objects to be propelled onto the plaintiff's property, but that where the injury results solely from concussion and vibration, recovery must be predicated on a showing of negligence. The court rejected this rule, partly because of the unjust results which it reaches, and partly because the eminent domain provision of the Oklahoma Constitution (Art. 2, 24) requires compensation in all cases where private property is damaged for public use. The Muskogee case was followed in Tibbets & Pleasant v. Benedict, supra, involving substantially identical facts. The court again stated that a rule requiring proof of negligence before damages are recoverable for injury caused solely by vibrations and concussions from blasting activity could not be adopted in the face of the Oklahoma Constitution.
 
 
 7
 A clear pronouncement of the purpose and effect of Sec. 23 is contained in Fairfax Oil Co. v. Bolinger, supra. The plaintiff was allowed to recover damages for the injury caused by vibrations from defendant's oil well drilling operations. The defendant's operations were perfectly legal, having been sanctioned by a zoning ordinance, and it was therefore argued that '* * * no recovery could be had without allegation and proof of some actionable negligence, or some unusual, unreasonable or improper use of defendant's property.' The court, after observing that defendant's contentions were predicated upon common law doctrine, said (186 Okl. 20, 97 P.2d 575):
 
 
 8
 'In this and many other states the common law rule does not obtain. Constitutional provisions have intervened to protect a property owner against losses in the nature of real and substantial injruy to his property, resulting from the use of adjacent or nearby property by its owner. * * * Though the use be legal, if property of another is substantially damaged as a result thereof, the latter may recover as for a nuisance in fact.'
 
 
 9
 The Fairfax case was followed in Phillips Petroleum Co. v. Vandergriff, supra, an action in which damages were recovered for injury to the plaintiff's house caused by vibrations from the motors used to operate defendant's booster station. As in the Fairfax case, the defendant's operations were properly located and were lawful, and there was no indication that they were ultrahazardous. British-American Oil Producing Co. v. McClain, supra, was another action growing out of damage caused by drilling operations. The court, in sustaining a judgment for plaintiff, said (191 Okl. 40, 126 P.2d 532):
 
 
 10
 'Defendants' argument is based upon the rule at common law. The acts complained of are in the nature of a private nuisance. Under the common law a private nuisance arose from the unwarrantable, unreasonable or unlawful use by a person of his own property to the injury of another. The nature of the use with regard to the particular locality or zone was the basic element for consideration in determining whether a private nuisance existed.
 
 
 11
 'But our Constitution has modified the common law. * * * In a case of this character the use need not be of a careless or negligent nature, or unreasonable or unwarrantable to entitle the injured party to recover.'[5]
 
 
 12
 The Court also held that the term 'private property' as used in Art. 2, 23 of the Constitution, is not limited to tangible subject matter, but includes the incidental right of the owner's peaceful occupancy and enjoyment of his premises and a recovery for the interference with that right was upheld. Considering the instructions as a whole, we conclude that they followed Oklahoma law and were not erroneous.
 
 
 13
 We do not agree with defendants' contention that there was insufficient evidence to sustain a verdict for exemplary damages.23 Okl.Stat.Ann. 9 provides that in an action for the breach of an obligation other than under a contract, 'where the defendant has been guilty of oppression, fraud or malice, actual or presumed, the jury, in addition to the actual damages, may give damages for the sake of example, and by way of punishing the defendant'. It has long been recognized that the theory of exemplary damages such as provided for in the foregoing statute is to set an example and punish the offender for the general benefit of the public. J. C. Penney Co. v. O'Daniell, 10 Cir., 263 F.2d 849; Tomlinson v. Bailey, Okl.,289 P.2d 384; Jordan v. Peek, Okl., 268 P.2d 242; Oden v. Russell, 207 Okl. 570, 251 P.2d 184; Empire Oil & Refining Co. v. Rawlings, 178 Okl. 391, 62 P.2d 1253; Tinker v. Scharnhorst, 129 Okl. 118, 263 P. 645. In Pure Oil Co. v. Quarles, 183 Okl. 418, 82 P.2d 970, 975, the court said that to entitle a plaintiff to recovery of exemplary damages, the proof must show some element of fraud, malice or oppression. The court then quoted the following statement from Keener Oil & Gas Co. v. Stewart, 172 Okl. 143, 45 P.2d 121:
 
 
 14
 '* * * 'the act which constitutes the cause of action must be actuated by, or accompanied with, some evil intent, or must be the result of such gross negligence, such disregard of another's rights, as is deemed equivalent to such intent.' * * *'
 
 
 15
 See also Fuller v. Neundorf, Okl., 293 P.2d 317; Fuller v. Neundorf, Okl., 278 P.2d 836; Ruther v. Tyra, 207 Okl. 112, 247 P.2d 964. It is quite evident from these Oklahoma decisions that exemplary damages are not limited to cases where there is direct evidence of fraud, malice or gross negligence, but may be allowed when there is evidence, of such reckless and wanton disregard of another's rights that malice and evil intent may be inferred. Considering the evidence most favorable to plaintiff, as we must, we think it was sufficient to support the jury's finding that the defendants' conduct amounted to a flagrant disregard of plaintiff's right to the enjoyment of his property. While the $3,625 verdict for exemplary damages may appear to be high, we are not inclined to interfere with the judgment of the jury and the District Judge in relation to it, with no showing that it was flagrantly outrageous, extravagant or that the jury was actuated by passion or prejudice. Tulsa City Lines v. Geiger, Okl., 275 P.2d 325; Oklahoma Transp. Co. v. Phillips, Okl., 265 P.2d 467; Kurn v. Margolin, 187 Okl. 135, 101 P.2d 818. The activities of the defendants were intermittently continuous from October 1954 to January 1958, and they knew what the effect was upon the plaintiff and his property but refused to do anything in an attempt to relieve the situation.[6] The validity of the verdict for exemplary damages is not affected by an allowance of actual damages for a lesser amount, and we are not persuaded that the required remittitur of actual damages should have been accompanied by a relative reduction of the punitive damages. While exemplary damages must bear some relation to the injuries inflicted and the cause thereof, they do not necessarily bear any relation to the amount of damages allowed by way of compensation.[7] 15 Am.Jur., Damages, Sec. 270; Jordan v. Peek, supra; Moyer v. Cordell, 204 Okl. 255, 228 P.2d 645; Lilly v. St. Louis & S.F. Ry. Co., 32 Okl. 521, 122 P. 502, 39 L.R.A., N.S., 663; Annotation 17 A.L.R.2d 527, 535; Annotation 81 A.L.R. 913; Annotation 33 A.L.R. 384, 398.
 
 
 16
 The defendants assert that the court erred in submitting to the jury certain elements of permanent injury to plaintiff's land and to growing crops, when there was no evidence of the value of these items. Whatever error, if any, there may have been in submitting this question of actual damages was cured by the remittitur. The court limited the recovery to specific items which were supported by the evidence and stipulated by the parties to be $2,419.51.
 
 
 17
 The court's refusal to grant defendants' motion for a new trial on the ground of plaintiff's misconduct in the presence of the jury is assigned as error. The motion states that during a court recess the plaintiff accused one of defendants' witnesses of testifying to a falsehood. The affidavits of two persons were to the effect that this accusation was made in a loud voice while plaintiff was in an angry mood; that members of the jury were nearby and could have heard the accusation and conversation between the witness and plaintiff. A mistrial or a new trial may be granted when remarks about a case are made within the hearing of the jury, which the court believes may have influenced the jury to the prejudice of either party, but the action of the court on such motions is discretionary. 89 C.J.S. Trial 457; Franklin v. Shelton, 10 Cir., 250 F.2d 92, certiorari denied 355 U.S. 959, 78 S.Ct. 544, 2 L.Ed.2d 533; Cabiniss v. Andrews, Okl., 258 P.2d 180; Watts v. Elmore, 198 Okl. 141, 176 P.2d 220; Hope v. Gordon, 174 Okl. 368, 50 P.2d 669; Myers v. Cabiness, 44 Okl. 671, 146 P. 33. There is nothing in the record to indicate that the trial court abused its discretion in not granting a new trial.
 
 
 18
 Finally, it is contended that the court erred in ordering the abatement of the condition which caused surface waters to accumulate upon the lands occupied by the plaintiff and which diverted waters from their natural courses onto plaintiff's land in unusual and excessive quantities. The court, while recognizing that the mining operation, as conducted by the defendants, was a legal business and that they were entitled to develop their leases and extract coal therefrom, found that the operation was conducted in such a manner as to interfere with the natural water courses running from the land adjacent to plaintiff's land, thereby causing an unnatural accumulation and diversion of water onto plaintiff's land. There is no contention that this finding was not supported by evidence. The Oklahoma courts have consistently held that in cases of this kind, similar equitable relief may be granted. Gregory v. Bogdanoff, Okl., 307 P.2d 841; Culbertson v. Greene, 206 Okl. 210, 243 P.2d 648; Rainey v. Cleveland, 203 Okl. 283, 220 P.2d 261.
 
 
 19
 Affirmed.
 
 
 
 [1]
 An employee of the defendants testified that in blasting within 500 feet of plaintiff's house, the amount of explosives for a single shot varied from 2200 to 3000 pounds
 
 
 [2]
 In regard to this, plaintiff testified:
 'Q. How is that equipment operated? A. It is operated by Diesel.
 'Q. How about this pudge you have described? A. It is operated by Diesel.
 'Q. Is there any other type of heavy equipment they use? A. Yes, sir. They have a loader which is similar to their pinner. It walks out on this boom and it has a bucket on it and it runs under this coal and digs it up and swings around and dumps it.
 'Q. Did they use and operate this equipment in the vicinity of your home? A. Yes, sir, they sure did.
 'Q. How close was it? West of me, from my house to where they were operating was, say, 85 feet.
 'Q. That was the closest they ever got this heavy equipment? A. No. They got closer than that when they were operating east of me. They were operating within 50 feet of my house when they were operating east of me.
 'Q. How did they operate this machinery and equipment you speak of? A. They operated this machinery 24 hours around the clock. They never did shut down. They run it 24 hours, around the clock. They had time to service it. They never did shut it down. Of course, the hauling part of it was mostly operated in daytime, although there was nights that they hauled until 9:00 or 10:00 o'clock at night.
 'Q. By 'hauling', you mean hauling coal? A. Yes, sir.
 'Q. Did they haul in the vicinity of your place at night? A. Yes, sir, they hauled a few nights. It wasn't too frequently they hauled at night but there was a few nights they hauled maybe from 8:30 to 9:00 o'clock at night.
 'Q. Was that close to your house? A. They come right through in 15 foot of my house.'
 
 
 [3]
 Article 2, 23 of the Oklahoma Constitution provides:
 'No private property shall be taken or damaged for private use, with or without compensation, unless by consent of the owner, except for private ways of necessity, or for drains and ditches across lands of others for agricultural, mining, or sanitary purposes, in such manner as may be prescribed by law.'
 
 
 [4]
 In Seismograph Service Corp. v. Buchanan, Okl., 316 P.2d 185, 187, the damage to plaintiff's farmhouse and other buildings was caused by seismograph explosions within 600 feet of plaintiff's property. The court reviewed the previous Oklahoma decisions involving damages from private nuisances, and quoted from British-American Oil Producing Co. v. McClain, 191 Okl. 40, 126 P.2d 530, 532, as follows: '* * * 'In a case of this character the use need not be of a careless or negligent nature, or unreasonable or unwarrantable to entitle the injured party to recover. If the use causes a substantial injury to the property of another, he may recover as for a private nuisance.' * * *' The court continued: 'This for the reason that our Constitution by Act. 2, 23, has modified the common law limitations on the doctrine of private nuisance. In view of these considerations, the defendant's argument that strict liability for its operations will unduly restrict economic development of a vital resource is not persuasive.'
 
 
 [5]
 The Court's syllabus in this case states: 'Where the facts show that a lawful business is being conducted in such manner as to constitute a private nuisance causing substantial injury to property, the aggrieved party may recover compensation for the injury sustained.'
 
 
 [6]
 The total disregard of the rights of the plaintiff is illustrated by a portion of plaintiff's testimony regarding his attempt to obtain some relief:
 'Q. What, if anything, did you do about these explosions when they began to annoy you? A. Well, the first time I ever said anything to them was, I went down to the pit--
 'Q. You said to them; would you identify 'them'? A. I went to Joe Grebbs, who is the foreman over the operating of the machinery and pits and all. In other words, all the men is under his supervision. He is the general superintendent.
 'Q. Whom does he work for? A. He works for Mr. Young.
 'Q. Is that Ernie Young? A. That is Ernie Young, the one that owns the equipment, and I went down to the pit where he was at and I asked him in a nice way, I asked Mr. Grebbs, I said, 'Can't you stop those shots?' He said to me, he said, 'Yes, I could,' but he never did tell me he would and then I went back to him again after that and mentioned the fact he was coming up to the house at that time. I will say in two days he would have dug up within forty-five or fifty feet of my house and I went to him again and asked him if he would turn that machine around and dig the other way and I said, 'We can't sleep on account of this machine. It makes a terrific noise. It just pops like a cannon. They was aiming right at my house.' He didn't even respect me enough to turn it around, after me going to him. My children couldn't sleep and I couldn't sleep when they would swing that. Those exhausts that close had the windows breaking like glass, and they didn't respect me enough to turn it around and dig out the other way.
 'Q. Did you tell Mr. Grebb or anyone working out there on that operation that your property was being damaged? A. Yes, sir, I mentioned it to Jim Cochreham.
 'Q. Who is Jim Cochreham? A. He is the pit boss. He is working under the supervision of Mr. Joe Grebb and he sees, I suppose he bosses the shooting and the loading.
 'Q. Bosses the shooting; that is, setting off the charges? A. Yes, sir.
 'Q. What did you say to him? A. I asked him one evening, I went over to the truck where he was at and stood there and talked to him and I asked him if he could get Joe to split them shots down when they were operating so close to my house. He said, 'I am just working under Joe.' and I mentioned the facts to him that I had mentioned to Joe and he told me as far as his part was concerned, he was working for Joe.'
 
 
 [7]
 Exemplary damages are not recoverable in the absence of actual damages. Brown v. Higby, 191 Okl. 173, 127 P.2d 195; Oden v. Russell, 207 Okl. 570, 251 P.2d 184, 187; Moyer v. Cordell, supra