Albert Lee HOBBS and Wanda Lee Campbell, Plaintiffs in Error,

v.

Frances WATKINS, Defendant in Error.

No. 42265.

Supreme Court of Oklahoma.

Feb. 23, 1971.

H. Tom Kight, Jr., Claremore, for plaintiffs in error.

Ben Franklin, Franklin, Harmon & Satterfield, Oklahoma City, and Ralph Brainard, Claremore, for defendant in error.

WILLIAMS, Justice:

The principal question posed for our determination by the present appeal is whether there was ample evidence to warrant submitting to the jury the question of whether defendants conspired to cause plaintiff's death in order to collect the $100,000.00 proceeds of a $50,000.00 double indemnity insurance policy on her life and injured her in attempting to carry out the plan. We hold there was. Pryor v. Harvey, 121 Okl. 288, 249 P. 905 (1926); Oller v. Hicks, Okl., 441 P.2d 356 (1968).

Defendant in error Watkins as plaintiff in the trial court sued defendant Hobbs and his daughter, Mrs. Campbell, and Hobbs' nephew, one Tidwell, alleging that defendants, acting in concert, conspired to willfully and deliberately murder her for the purpose of collecting the $100,000.00 proceeds of a $50,000.00 double indemnity insurance policy which they had fraudulently caused her to take out on her own life as arranged for by them with Mrs. Campbell as beneficiary. Plaintiff did not procure service of summons on defendant Tidwell. The remaining defendants filed an answer denying plaintiff's claims.

The proof offered on behalf of plaintiff tended to show that Mrs. Campbell owned an undivided half interest in the minerals in and under a farm which Hobbs and his deceased wife, prior to Mrs. Hobbs' death, had given to the daughter by deed; that Mrs. Watkins had been in the custom interior decorating business for herself in Oklahoma City but had gone to work for a publishing house out of Chicago; that her job required her to travel and assist local women's groups with fund-raising projects; that she met Hobbs on one of her business trips and soon was meeting him often and would drink some with him.

Plaintiff testified that on an occasion when they were driving around together, Hobbs showed her a rural property and stated it was his place and that some machinery setting there was his but that he told her he couldn't show her inside the home.

Plaintiff testified that Hobbs told her he wanted to get the mineral rights which he and his now-deceased wife had deeded to

Mrs. Campbell, back in his own name; that he would like for Mrs. Watkins, to buy them.

Mrs. Watkins did purportedly buy the minerals for $100,000.00 and executed an installment note in the amount of One Hundred Thousand Dollars ($100,000.00) payable $100.00 per month and $4,000.00 in the month of May of each year thereafter. Defendant Campbell deeded the minerals to plaintiff and plaintiff gave Mrs. Campbell a mortgage covering the minerals, securing the $100,000.00 note. The interest rate on unpaid principal provided for in the note was one per cent (1%) per annum.

Mrs. Watkins testified Hobbs led her to believe he intended to marry her and that he assured her that he would see she would not be out any money in paying the note given for the minerals.

Mrs. Watkins bought a $50,000.00 double indemnity insurance policy with Mrs. Campbell designated as the beneficiary thereof the same day she received the mineral deed and executed and delivered the note and mortgage. She paid the premium for the first year on the insurance policy with her own check in the amount of $459.59. The check was cashed and cleared. In exchange for the check, plaintiff received a conditional receipt (binder) from the company's soliciting agent.

Mrs. Watkins said she later had a mineral deed prepared to give the mineral interest back to Mrs. Campbell but kept it a while and later destroyed it.

Mr. Hobbs, called as a witness for plaintiff admitted that back in 1960 when his wife and he bought one half the minerals under their farm (the same amount Mrs. Campbell purportedly sold to plaintiff for $100,000.00) his wife and he paid therefor the amount of consideration recited in the mineral deed they took, to-wit: $250.00.

Later, on cross-examination he testified that he didn't think a person "would be stupid to pay anywhere in the neighborhood of $100,000 for that mineral interest out there" but that he really was not qualified to answer as to what a fair price for the property would be. He admitted having heard Mrs. Campbell testify she had received five or six checks in the past 8 or 10 months for from $22.00 down to $2.00 in royalty payments.

Plaintiff testified that on the day the alleged attempt to murder her occurred, being a Sunday, she saw defendant Hobbs and his nephew on Highway 33 near Bristow and arranged to meet him at the Chandler gate on the (Turner) Turnpike between 4:00 and 4:30 P.M.; that on later meeting him Hobbs got into her Rambler station wagon and drove it and the nephew drove Hobbs' blue Dodge automobile; that she had understood they were going to Oklahoma City but that they turned toward Tulsa; that Hobbs explained that he had to meet a man who was going to pay Hobbs Eight Thousand Dollars ($8,000.00) cash for some cutters sold to the man from off Hobbs' bulldozer.

Plaintiff testified that they drove through Tulsa and on east and turned on a county gravel road and came to a place where Hobbs backed her car into a little path beside the road that it appeared cars had been driven into and stopped and waited. She said Hobbs had brought a fifth of whiskey and that he drank some and she took a couple of drinks with him but that her state of consciousness was not affected thereby.

Plaintiff testified Hobbs' nephew later came along in Hobbs' car and stopped near where they were stopped. She said Hobbs asked the nephew to bring his gun to him out of Hobbs' car, explaining someone might try to rob them. Plaintiff said the nephew brought a gun that looked different from the one Hobbs usually carried in his car and brought a six-pack of beer; that the nephew drank out of the six-pack and that she drank perhaps half a can of beer.

Plaintiff said she was sitting in the front seat of her car with her knees up in the seat and her feet under her, talking with Hobbs who was under the steering wheel and the nephew who was outside the

right open front door, stooped down on his heels. Plaintiff said, "The last I remember I was looking at the nephew—and that is all," that she lost consciousness; that the next thing she knew, she had "started to come to," that she "had been completely turned around in the seat" and was lying down on the seat with her head toward the steering wheel, that she guessed her feet were in the floor of the car, that she "knew immediately that the car had been moved" and "realized by the incline of the car that it was setting on a railroad track." She said she raised up and Albert Hobbs and the nephew were standing on the outside of the open door on the right hand side of the car. She said she pushed herself up off the seat and turned around and looked at Albert and said, "why, Albert, why." She said Hobbs responded that, "Fran, you made me mad" and took her by the shoulder and upper part of her arm and sent the nephew for the other fifth of whiskey out of his car; that the nephew brought it to Hobbs and Hobbs shoved her back down on the seat and Hobbs hit her with the whiskey bottle and she lost consciousness.

She said that later she heard the train and saw the light from its headlight, got out of the car on the right side (nearer the train) ran to the back of the car and into the brush; that she again lost consciousness and did not hear the train stop; that she came to again, saw the men with lights searching in the weeds, knew she needed help and called to the men; that an ambulance was called and she was taken to Hillcrest Hospital arriving about 10:00 P.M.

The engineer of the train testified that as the train rounded the bend and headed for the crossing where plaintiff's car was stopped on the track, he saw a woman jump out of the car on the left hand side and stagger back toward the southwest; that the front of her dress looked all red; that he put on the train brake and emergency application; that his eyes followed the woman and got a glimpse of what appeared to be someone standing beside a blue car with the door partly open, stopped on the road to the south of the railroad crossing where plaintiff's car was.

The engineer, Mr. B., testified that the train knocked plaintiff's car clear of the track and the two engine units and seven cars travelled a little more than a car length past the crossing; that he walked back to the crossing and saw plaintiff with blood running down over her face and all down the front of her dress; that she acted like she was in a daze, appeared to be in a sort of state of shock; that a fifth of Jack Daniels whiskey with some gone was found in the car and the neck of a whiskey bottle and a white cotton glove with knitted blue garnut were picked up at the crossing, to be turned over to the officers by the conductor as the witness understood.

Engineer B. further testified it was part of his job to find out from Mrs. Watkins what had happened; that she told him Albert Hobbs had hit her on the head and put her on the tracks "and he was trying to get rid of her or something;" "she mentioned something about some kind of a deal or something, or insurance or something;" "it was something about there was a insurance policy on her or something;" "And he wanted to get rid of her." He said, " * * * we was back there until the ambulance came and trying to help her all we could because she was quite stunned and looked like she was, well I would say about ready to pass out * * * " The witness did not think she was intoxicated.

Testimony was introduced on behalf of defendants of effect that plaintiff was a person who was seen around places that sold beer, that she had bumped into another automobile, had bumped into a bridge, had pulled her car off the road and taken a nap, that she had travelled down a street in her automobile on the wrong side, etc.

Defendant Hobbs branded plaintiff's recital of the alleged meeting and occurrences on the Sunday in question as "untrue." He said he was at home at the times plaintiff claims to have been injured and left on the railroad track. He said

plaintiff was quite a drinker and that he decided he wanted nothing to do with her and quit seeing her two weeks or so before the Sunday here involved.

Mrs. Campbell testified that plaintiff found out some way unknown to the witness that she had the mineral rights in question and called her on the telephone concerning selling her an interest and that the witness talked to her father about the matter and decided to price same to Mrs. Watkins at $100,000.00 for the half interest. She said she never did call Mrs. Watkins but Mrs. Watkins kept calling her about the subject. She testified that she and her father did not have any discussion about murdering plaintiff for the purpose of collecting her insurance. She said that there was no agreement between her father and herself that Mrs. Watkins was purchasing the mineral interest from the witness for the father. The witness testified Mrs. Watkins, shortly before going to the lawyer's office to enter into the transaction for the sale of the mineral rights, told Mrs. Campbell she would be "willing to have a insurance policy made out with me as beneficiary in case something happened to her and that way there wouldn't be no involvement of her children and I would get my money;" that plaintiff told her at the same time plaintiff wanted to leave her property clear for her children.

Plaintiff had originally sued for $50,-000.00 for mental and physical impairment, $50,000.00 for impairment of earning capacity, $50,000.00 for disfigurement, embarrassment and humiliation, $50,000.00 for medical and other necessary expenses or $200,000.00 actual and $200,000.00 punitive damages. After plaintiff had closed her case in chief she requested and was granted permission to file an amendment to petition reducing amounts sued for. In the amendment later filed she asked for $5,-000.00 actual damages under each heading listed next above or $20,000.00 actual damages and $50,000.00 punitive damages or a total of $70,000.00.

At the conclusion of the trial, the jury returned a verdict against defendant Wanda Lee Campbell for $25,000.00 and a separate verdict against defendant Albert Lee Hobbs for $45,000.00. The judge of the trial court told the jury that the court needed advice from the jury "as to whether the figures submitted on the two verdicts is a total amount, or whether one figure is included in the other." He continued, "If this is a total amount then you should use the form of verdict wherein you find for the plaintiff against the defendant, Albert Lee Hobbs and Wanda Lee Campbell, if it is not a total verdict, then your verdict should be against them for the lesser amount."

Thereafter, the jury returned into court a second time with a verdict finding "for the plaintiff and against the defendants Albert Lee Hobbs and Wanda Lee Campbell, and fix the amount of her recovery at $70,000.00. Full amount ask for—Wanda Lee Campbell to pay $25,000.00 of above amount and Albert Lee Hobbs to pay $45,000.00." Thereupon at request of defendants, upon being polled each member of the jury said that was his or her verdict and the court ordered, to-wit: "Let the record show the jury having returned into open Court found in favor of the Plaintiff in the sum of $70,000.00." In journal entry of judgment filed in the case, the court recited order striking the portion of the second verdict apportioning amounts to be paid by the respective defendants as surplusage and ordered that the second verdict be entered against the defendants, jointly and severally, in the total amount of $70,-000.00, to which defendants objected.

From the judgment and order overruling their motions for new trial, the defendants have appealed.

Defendants caption their first proposition of error as follows: "Errors of law occurring at the trial of this cause, irregularity in the proceedings of the court and prevailing party, and abuse of discretion by

which the defendants were prevented from having a fair and impartial trial."

■ It is first argued that plaintiff's statements to Engineer B. are narrative rather than spontaneous in character. We do not agree. We believe the trial court properly determined such statements made within some few minutes after plaintiff awakened in front of the on-coming train to be part of the res gestae. Huffman v. Gaylor, Okl., 267 P.2d 564, 567 (1954).

■ Complaint is made as to permitting the amendment to reduce the amounts sought by plaintiff under various headings. Defendants cite no authority. We do not agree. Lusk v. Phelps, 71 Okl. 150, 175 P. 756, 760 (1918) citing statute, now 12 O.S. 1961 § 317.

■ Finally, under this proposition defendants complain of the want of proof to sustain the amount of verdict for plaintiff's actual damages. To our minds, plaintiff's proof sustained not more than $1,000.00 of the $5,000.00 she sought and for which she apparently obtained judgment, for medical and other expenses. In our view, plaintiff should remit at least $4,000.00 of the $20,000.00 actual damages purportedly awarded her. Tipton v. Standard Installment Finance Co., Okl., 418 P.2d 309 (1966).

For their second proposition, defendants assert "Error of the court in admitting as evidence on the part of the plaintiff, over the objections of the defendants, certain exhibits not properly identified, and which were inflammatory."

■ It is argued that it was error to permit introduction of the three exhibits to which reference has been made hereinabove and particularly to the glove, since nobody testified to having seen it used in any aspect of the case. No authorities are cited. The Highway Patrolman got the items from the train crew and kept them except for periods they were in the possession of the Oklahoma Bureau of Investigation and the Sheriff. He threw the bloody dress in the trash. Pictures of the three exhibits are included in the record before us. No harmful error in permitting their introduction in evidence has been demonstrated.

Defendants' third proposition asserts: "Error of the court in overruling the demurrer to plaintiff's evidence by the defendant, Wanda Lee Campbell."

■ Defendant Campbell argues that there is no evidence of any conspiracy except that of her co-defendant and plaintiff to get her mineral interest "without her knowledge as to who the actual purchaser was." She argues that "The record is absolutely void of any acts or conversations whatever between the defendants, Campbell and Hobbs, to do harm or injury to the plaintiff, or otherwise. Any relation between the purchase of the insurance policy by the plaintiff on her life, as provided in the mortgage agreement covering the sale of defendant's mineral interest, and the alleged occurrence on the evening [in question] would be purely conjectural." No authority is cited.

■ That the parties to an alleged conspiracy actually agreed to do the things alleged may be shown by circumstantial evidence. The trial court is permitted great latitude in admitting such evidence. Admission thereof is within the sound discretion of the court. Co-conspirators are liable for all that is done in pursuance of the conspiracy until its object is accomplished. Democrat Printing Co. v. Johnson, 71 Okl. 128, 175 P. 737 (1918). See Pa. Glass Sand Corp. of Okla. v. Ozment, Okl., 434 P.2d 893, 897–898 (1967).

Proposition IV advanced by defendants asserts: "Error by the court in overruling the demurrer to plaintiff's evidence by the defendant, Albert Lee Hobbs."

■ The argument runs that plaintiff's testimony is not corroborated except for the alleged res gestae statements of plaintiff testified to by the railroad engineer, that plaintiff's statements on that occasion were deliberate and not instinctive, and that the testimony of both the plaintiff and

the engineer is highly improbable in the suggested aspects.

No authority is cited. We do not agree. We have already upheld admission of the engineer's testimony as to plaintiff's statements immediately following the principal episode.

In ruling upon demurrer to plaintiff's evidence, the court properly could consider it to be true and disregard all evidence and inferences of contrary effect. Price v. Smith, Okl., 373 P.2d 242 (1962).

For their fifth proposition, defendants contend that: "The verdict by the jury and judgment by the court are contrary to and not supported by the evidence, are based upon conjecture and for excessive actual and exemplary damages, appearing to have been given under the influence of passion or prejudice." Defendants reiterate the gist of their last two previous propositions, asserting dearth of corroborative evidence substantiating plaintiff's story as against either defendant, and emphasizing the testimony of three peace officers, two other public employees, two waitresses, Mr. Hobbs' farm tenant and tenant's wife, and Mr. Hobbs' single daughter's date who gave testimony of effect that Mrs. Watkins did some drinking, that she pursued Mr. Hobbs and said she wouldn't let him brush her off, and that Mr. Hobbs was at his home on the Sunday afternoon and evening in question.

Defendants argue that "Not only the finding of the defendants guilty of a conspiracy to murder the plaintiff based upon what evidence and testimony was offered, but the measure of damages allowed the plaintiff, would both be purely conjectural."

They further argue of effect that the exemplary damages allowed by the jury bear but slight, if any, relation to the actual damages proven.

Our statute 23 O.S.1961 § 9 provides that:

"In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud or malice, actual or presumed, the jury, in addition to the actual damages, may give damages for the sake of example, and by way of punishing the defendant."

In Morgan v. Bates, Okl., 390 P.2d 486, 488 (1964), this Court (p. 488) said:

" 'The authorities are uniform in holding that to constitute willful or wanton negligence it is not necessary to show ill will toward the person injured, but an entire absence of care for the life, person, or property of others which exhibits indifference to consequences makes a case of constructive or legal willfulness. A complete indifference to consequences distinguishes wrongs caused by wantonness and recklessness from torts arising from negligence. Many cases sustain this general proposition * * *.

" '* * *

" ' "The law is regardful of human life and personal safety, and if one is grossly and wantonly reckless in exposing others to danger, it holds him to have intended the natural consequences of his act, and treats him as guilty of a willful and intentional wrong." ' "

In the 1959 opinion of the U. S. Court of Appeals, Tenth Circuit, affirming a decision of the U. S. District Court for the Western District of Oklahoma, Garland Coal & Mining Co. v. Few, 267 F.2d 785, 790–791, the Court said:

" * * * It is quite evident from these Oklahoma decisions that exemplary damages are not limited to cases where there is direct evidence of fraud, malice or gross negligence, but may be allowed when there is evidence of such reckless and wanton disregard of another's rights that malice and evil intent may be inferred. Considering the evidence most favorable to plaintiff, as we must, we think it was sufficient to support the jury's finding that the defendants' conduct amounted to a flagrant disregard of plaintiff's right to the enjoyment of his property. While the $3,625 verdict for exemplary damages may appear to be

high, we are not inclined to interfere with the judgment of the jury and the District Judge in relation to it, with no showing that it was flagrantly outrageous, extravagant or that the jury was actuated by passion or prejudice. * * * The validity of the verdict for exemplary damages is not affected by an allowance of actual damages for a lesser amount, and we are not persuaded that the required remittitur of actual damages should have been accompanied by a relative reduction of the punitive damages. While exemplary damages must bear some relation to the injuries inflicted and the cause thereof, they do not necessarily bear any relation to the amount of damages allowed by way of compensation."

See Pa. Glass Sand Corp.·of Okla. v. Ozment, Okl., 434 P.2d 893 (1967) supra, citing Garland Coal and Mining Co. v. Few, supra.

■ The argument that the verdict was against the clear weight of the evidence, etc. is in disregard of the principle that in a case of legal cognizance the determination is for the trier of the facts and this Court will not reverse the judgment entered on such ·a verdict absent a showing that the same was clearly based upon caprice or without reasonable foundation. National Life and Accident Ins. Co. v. Roberson, 180 Okl. 265, 68 P.2d 796 (1937).

For their sixth proposition of error, defendants assert: "Error of the court in permitting the jury to return an improper verdict." Argument is presented that a verdict should be a general verdict against all defendants in a given and the same amount, if at all.

In our view, the verdict in this case, after surplusage was stricken by the trial court, meets the standard suggested by defendants' authorities. Whitney v. Tuttle, 178 Okl. 170, 62 P.2d 508 (1936).

It is stated that "Over the objections of the defendants, the court's instructions to the jury numbered 2, 3, 4 and 6, were upon the issue of conspiracy and the liability of the defendants therefor as joint tort feasors." One must except to instructions in order to preserve a question as to their validity. 12 O.S.1961 § 578 (amended since trial of the present case). McKee v. Neilson, Okl., 444 P.2d 194, 199 (1968). Defendants did not timely object to the giving of such instructions. Nor do they now assert any error in the giving of them.

■ Complaint is made of failure of the trial court to submit separate verdicts as to plaintiff's claim for actual damages and separate ones for her request for exemplary damages. Defendants did not request separate submission of these matters. No error requiring reversal was made. Pine v. Duncan, 179 Okl. 336, 65 P.2d 492, 494–495 (1937); Pryor v. Harvey, 121 Okl. 288, 249 P. 905 (1926).

For their seventh proposition defendants assert: "Error of the court in not declaring a mistrial upon motion of defendants after prejudicial matter was raised by counsel for plaintiff."

■ The main argument presented under this head is that Mr. Hobbs was asked in the presence of the jury if he had not collected insurance on her life after the death of his wife. Counsel hastened to move that the jury be excused, which was done. Thereupon he moved for a mistrial, observing to the court that no criminal charge had arisen out of the collection of proceeds of policy on the life of the wife. The court overruled the motion for mistrial on the ground that "I don't think we have gone into it far enough to declare a mistrial." The court offered to sustain objection as to admissibility of any answer (the question had not yet been answered by the witness) and objection was sustained but motion to declare mistrial was denied. The jury was called back to the courtroom. The court dictated a recital to the record "that an opportunity was given to counsel for the defendants to have the jury admonished not to consider the statement but upon consideration he stated he did not want them admonished." Counsel added,

"For the reason that it would only further the damage done by the question asked."

The argument is that plaintiff's counsel knew of defendant Hobbs having collected insurance after his wife's death and that the newspapers in the area had reported the case as the train-death plot. The argument continues, "Defendants believe that if counsel for plaintiff had not already effectively conveyed to the jury the amount the defendant, Hobbs, had collected from such insurance by amending plaintiff's petition from the $400,000 originally sought, to $70,000, then certainly by this line of questioning counsel conveyed to the jury that defendant, Hobbs, had collected an insurance policy on the life of his wife."

Authorities are presented of effect that where an admonition to the jury to disregard prejudicial matter is not sufficiently curative, the court should declare a mistrial.

We see no particular harm demonstrated in the record. The jury would have been warranted already from other evidence in the record in believing that defendants knew the purposes served by a policy of life insurance in the event of the death of the insured. It does not appear that the question inferred more. The trial court sustained the objection and offered to admonish the jury to forget it. No error was committed in denying motion for mistrial. Defendants in order to be entitled to a mistrial would be required to show that their rights were prejudiced. Witte v. Fullerton, Okl., 376 P.2d 244, 249. See also Muenzler v. Phillips, Okl., 276 P.2d 221, cited by both plaintiff and defendants.

The judgment of the trial court will not be reversed on account of the error in allowing $5,000.00 for medical and other necessary expenses. However, the judgment is modified to require that a remittitur in the amount of $4,000.00 be filed by plaintiff in the trial court within time to be fixed by the trial court and as modified the judgment is affirmed, in other respects. Upon failure to file such remittitur within such time as set by the trial court, such judgment shall stand reversed. Tipton v. Standard Installment Finance Co., Okl., 418 P.2d 309, 316 (1966).

Judgment modified and affirmed as modified, upon condition of remittitur. Otherwise same is reversed.

All the Justices concur.