CONTINENTAL TREND RESOURCES, INC.; Harold G. Hamm, Trustee of the Harold G. Hamm Revocable Inter Vivos Trust; Gary H. Wright; Cindy Wright; Jeffrey B. Hume; Farrar Oil Company, Plaintiffs–Appellees,

v.

OXY USA INC., Defendant–Appellant,

and

Williams Natural Gas Company, Defendant.

CONTINENTAL TREND RESOURCES, INC.; Harold G. Hamm, Trustee of the Harold G. Hamm Revocable Inter Vivos Trust; Gary H. Wright; Cindy Wright; Jeffrey B. Hume; Farrar Oil Company, Plaintiffs–Appellants,

v.

OXY USA INC. and Williams Natural Gas Company, Defendants–Appellees.

Nos. 92–6350, 92–6384.

United States Court of Appeals, Tenth Circuit.

Jan. 12, 1995.

W. DeVier Pierson (Mark E. Greenwold, also of Pierson Semmes and Bemis, Washington, DC, Robert F. Hill and Ronald L. Wilcox of Hill & Robbins, Denver, CO, James M. Peters and Robert C. Smith, Jr. of Monnet, Hayes, Bullis, Thompson & Edwards, Oklahoma City, OK, with him on the briefs), for defendant-appellant/cross-appellee OXY USA Inc.

Eric S. Eissenstat (Burck Bailey and Dino E. Viera, also of Fellers, Snider, Blakenship, Bailey & Tippens, Allan DeVore, Oklahoma City, OK, Randy Moeder, Gen. Counsel, Continental Resources, Inc., Enid, OK, with him on the briefs), for plaintiffs-appellees/cross-appellants Continental Trend Resource, Inc. et al.

D. Richard Funk and C. Kevin Morrison of Connor & Winters, Tulsa, OK, as counsel for

Williams Natural Gas Co., joined in the response brief filed, for OXY USA Inc. in No. 92–6384.

Before McWILLIAMS and LOGAN, Circuit Judges, and BROWN, District Judge.*

LOGAN, Circuit Judge.

Defendant OXY USA Inc. (OXY) appeals (No. 92–6350) a judgment entered after a jury verdict for plaintiffs[1] on their state tortious interference with contract claims and on OXY's counterclaim for breach of contract. Plaintiffs cross-appeal (No. 92–6384) the court's entry of summary judgment for OXY on plaintiffs' federal antitrust claims and its denying plaintiffs attorney's fees for defending against OXY's counterclaim.

OXY first argues that we must reverse the tortious interference verdict because the district court erred in instructing the jury on the elements of tortious interference with existing and prospective contracts. OXY secondly argues that we must reverse the $30,000,000 punitive damages awarded in connection with the tortious interference claim because: (1) the jury instructions were erroneous, (2) the jury was permitted to award punitive damages for conduct (breach of contract and contract damages) for which punitive damages are not permitted under state law, (3) the procedures followed by the district court deprived OXY of due process of law, and (4) the punitive damages award was so excessive that it violated substantive due process and Oklahoma law. Alternatively, OXY asks us to order a remittitur. OXY

finally argues that it is entitled to a new trial on its counterclaims for breach of contract because the court failed to properly instruct the jury.

Plaintiffs assert in their cross-appeal that the district court erred in dismissing their antitrust claims and in denying their attorney's fees for defending against OXY's breach of contract counterclaim.

I

*Background*

Plaintiffs own interests in gas wells in the Sooner Trend, a four-county area in Oklahoma. About 140 of these wells were connected to the Rodman gas gathering system owned by defendant Williams Natural Gas Company (WNG).[2] The Rodman system collected natural gas from wells in the Sooner Trend and transported it to the Rodman gas processing plant. OXY was part owner of the Rodman processing plant and operated both the plant and the gathering system.[3] The Rodman plant extracted natural gas liquids and dehydrated and compressed gas from the Rodman gathering system; the tailgate of the Rodman Plant fed into WNG's high pressure interstate pipeline. WNG did not own any facilities to compress or dehydrate gas.[4] Plaintiffs' gas required some dehydration in order to meet the WNG pipeline's quality requirements and compression to enter WNG's high pressure line.

Before the mid–1980s all of the gas on the Rodman system was sold to WNG for resale to its customers. In July 1988 WNG began offering gathering and transportation ser-

---

* The Honorable Wesley E. Brown, Senior United States District Judge, United States District Court for the District of Kansas, sitting by designation.

1. Plaintiffs are Continental Trend Resources, Inc., Harold G. Hamm, Trustee of the Harold G. Hamm Revocable Inter Vivos Trust, Gary H. Wright, Cindy Wright, Jeffrey B. Hume, and Farrar Oil Company.

2. In 1985, plaintiffs acquired a number of contracts giving them an interest in wells connected to the Rodman system. These contracts included gas purchase contracts with WNG that were allegedly coterminous with gas processing agreements with OXY and gas purchase contracts with OXY.

3. WNG owned the gathering lines; OXY operated and maintained those lines. This arrangement originated with the predecessors in interest of OXY and WNG to avoid uneconomical gas processing at the Rodman plant.

4. After the district court's entry of summary judgment on the antitrust claims, WNG and OXY transferred their interests in the Rodman gathering system to Trident NGL, Inc. and Oryx Energy Co., and the Federal Energy Regulatory Commission (FERC) entered an order approving abandonment of the Rodman gathering system from FERC jurisdiction. *Williams Natural Gas Co.*, 61 F.E.R.C. ¶ 61,285 (1992).

vices on the Rodman system as an open access transporter pursuant to the Federal Energy Regulatory Commission (FERC) Order No. 436, which enabled gas producers to deal directly with gas buyers rather than through intermediary interstate pipelines. An open access transporter is required to

> provide access to all shippers on a "first-come, first-served" basis, even if the shipper intends to compete with the pipeline company in the sale of gas.... The purpose ... is to increase downstream competition in natural gas sales by ensuring that sellers who do not transport their own gas have access to transportation facilities.

*Colorado Interstate Gas Co. v. FERC*, 890 F.2d 1121, 1123 (10th Cir.1989) (citations omitted); *see also Northern Natural Gas Co., (Div. of Enron Corp.) v. FERC*, 929 F.2d 1261, 1263–64 (8th Cir.), *cert. denied*, 502 U.S. 856, 112 S.Ct. 169, 116 L.Ed.2d 132 (1991) (open access policy was means by which FERC sought to increase competition in the market for natural gas). WNG's tariff set forth the terms and conditions of service, including the fee for transporting gas.

In 1989, plaintiffs asserted that their gas purchase and processing contracts with defendants had expired or terminated[5] and sought open access so that they could sell gas to entities other than WNG and OXY. However, WNG denied plaintiffs' requests to transport gas to other parties. Plaintiffs assert that OXY and WNG told them that bypassing the Rodman plant was impossible.

Plaintiffs then filed the instant suit in June 1990, alleging that OXY and WNG violated federal and state antitrust laws by monopolizing and conspiring to monopolize transportation and processing of gas with contracts tying gas processing to gas transportation, and by denying plaintiffs access to essential facilities. Plaintiffs also contended that defendants tortiously interfered with plaintiffs' existing and prospective contracts under Oklahoma law. In support of the tort claim, plaintiffs alleged that although OXY knew that its gas purchase or processing contracts with plaintiff had expired or were invalid, OXY refused to allow plaintiffs to utilize the Rodman system to market gas, and shut-in plaintiffs' wells, stopping their flow of gas. Plaintiffs also claimed that OXY contacted potential purchasers of plaintiffs' gas, and falsely asserted OXY had contractual rights to that gas. OXY counterclaimed, alleging conversion and that plaintiffs breached their contractual duties to OXY by attempting to sell gas to third parties. In its counterclaims OXY asserted that its contracts with plaintiffs continued to be valid.

The district court granted defendants' summary judgment motion on the federal and state antitrust claims, but denied summary judgment on the tortious interference state claims.[6] The remaining claims and counterclaims were then tried to a jury.

OXY and WNG moved for a directed verdict at the close of plaintiffs' evidence on the tortious interference claims. The district court granted WNG's motion but denied OXY's, except as to certain damages. The district court also denied plaintiffs' motion for a directed verdict on OXY's contract counterclaims, except as to certain wells. At the conclusion of the evidence the district court found that there was clear and convincing evidence on which OXY could be found liable for punitive damages under Okla.Stat. tit. 23, § 9, and submitted the punitive damages question to the jury.[7]

The jury rendered a general verdict for plaintiffs on the tortious interference claim

---

5. In 1989, plaintiffs brought suit in Oklahoma state court, alleging that OXY had breached four groups of contracts—the Mosier Farm, the casinghead gas, the processing agreements, and the Henneman contracts—and requesting, among other relief, formal rescission of those contracts and damages. There is no indication in the record that this litigation was other than pending at the time of trial.

6. The district court also denied plaintiffs' motion for partial summary judgment on the validity of certain processing agreements and a November 3, 1987 letter agreement.

7. Okla.Stat. tit. 23, § 9 provides that punitive damages are limited to the amount of actual damages unless before submitting the case to the jury the judge makes a finding "that there is clear and convincing evidence that the defendant is guilty of conduct evincing a wanton or reckless disregard for the rights of another, oppression, fraud or malice, actual or presumed."

against OXY and awarded compensatory damages of $269,000 [8] and punitive damages of $30 million. The jury returned a general verdict against OXY on its contract counterclaims. The district court denied OXY's motions to alter or amend the judgment, for remittitur, for judgment notwithstanding the verdict, or for new trial. These appeals followed.

## II

### Tortious Interference Claims

OXY asserts that we must reverse the jury verdict on tortious interference because it was based on improper jury instructions. Although in a diversity case the substance of jury instructions is a matter of state law, the acceptance or refusal of a tendered instruction is a procedural matter governed by federal law. *Farrell v. Klein Tools, Inc.,* 866 F.2d 1294, 1296 (10th Cir. 1989). In reviewing jury instructions we consider them as a whole and ask whether they accurately stated the governing law and provided the jury with an ample understanding of the issues and the applicable standards. *Brown v. Wal-Mart Stores, Inc.,* 11 F.3d 1559, 1564 (10th Cir.1993). The controlling questions are whether the jury was misled and whether the instructions provided an understanding of the issues and explained the jury's duty to determine those issues. *Estate of Korf v. A.O. Smith Harvestore Prods., Inc.,* 917 F.2d 480, 484 (10th Cir. 1990). We will reverse only if an erroneous instruction is prejudicial in light of the record as a whole. *Mason v. Texaco, Inc.,* 862 F.2d 242, 246 (10th Cir.1988) (*Mason I*).

Oklahoma law requires a party claiming tortious interference with contract or business relations to prove that (1) it had a business or contractual right that was interfered with, (2) the interference was malicious and wrongful (not justified, privileged, or excusable), and (3) the interference proximately caused damage. *James Energy Co. v. HCG Energy Corp.,* 847 P.2d 333, 340 (Okla.1992); *Waggoner v. Town & Country Mobile Homes, Inc.,* 808 P.2d 649, 654 (Okla. 1990), *limited on other grounds by Dutsch v. Sea Ray Boats, Inc.,* 845 P.2d 187, 193 (Okla. 1992). For purposes of this appeal we accept plaintiffs' proposition that the plaintiff in a prospective contractual relations case must show absence of privilege or justification.[9] *See Amerinet, Inc. v. Xerox Corp.,* 972 F.2d 1483, 1505–07 (8th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1048, 122 L.Ed.2d 356 (1993). We review OXY's specific arguments with regard to the jury instructions within this Oklahoma law framework.

OXY asserts that the district court erred in refusing to instruct the jury that (1) OXY's refusal to deal could not constitute tortious interference; (2) communication of truthful information could not constitute tortious interference; and (3) performance of a contract is relevant to the interpretation and validity of the contract. OXY relies in part on supplemental jury instructions that it claims to have tendered to the district court before the close of the trial; however, these supplemental jury instructions were not part of the district court record. Our review of the tortious interference jury instructions does not include the proposed supplemental instructions, which are not part of the district court or appellate record.[10]

---

8. The district court permitted plaintiffs to present two categories of damages to the jury: (1) "market value damages" of approximately $90,-000 for gas that actually flowed but was sold at a lower price than plaintiffs claimed they could have received; and (2) "shut in damages" of approximately $178,000 for gas that did not flow. *See* VII Appellant's App. 2382, 2420–21.

9. Defendants point out that no Oklahoma case has yet held a party liable for tortious interference with prospective contractual relations.

10. Plaintiffs filed a motion to strike portions of the Supplemental Appendix to Reply Brief of

Appellant OXY USA Inc. and Response Brief of Cross–Appellees OXY and Williams Natural Gas Co. (supplemental appendix) because they included materials not in the district court record. OXY moved to supplement the record approximately 21 months after the trial. The district court denied that motion, stating "[i]t is simply too late in the game to add these [proposed jury] instructions to the record. Defendant has previously taken the position, adverse to plaintiffs, that any instructions submitted after March 6, 1991 were out of time, yet now wants to add unfiled instructions dated April 24, 1991." III Appellant's Reply App. 4092. We grant plaintiffs' motion to strike the "proposed" jury in-

■ OXY first claims the district court erred in refusing to instruct the jury that any refusal to deal by OXY could not constitute tortious interference. OXY specifically objected to the instructions given, preserving this issue for appeal. *See* Fed.R.Civ.P. 51; *Weir v. Federal Ins. Co.*, 811 F.2d 1387, 1390 (10th Cir.1987) (purpose of Fed.R.Civ.P. 51 is to "provide[ ] the trial court with an opportunity to make proper changes to the jury instructions"); *see also Elmore v. United States*, 843 F.2d 1128, 1133 (8th Cir.1988) (timely and proper objection that apprised the district court of an alleged omission in instructions preserved error on appeal despite failure to propose instruction).

We reject OXY's contention that the district court erred in declining to instruct the jury on a refusal to deal. "Plaintiffs did not argue that OXY's refusal to deal with Plaintiffs caused them damages. Rather, Plaintiffs [asserted] that it was OXY's 'requirement to deal' in order to use WNG's System which harmed Plaintiffs." Answer Brief of Plaintiffs–Appellees/Cross–Appellants to OXY USA Inc.'s Brief-in-Chief and Brief-in-Chief of Plaintiffs–Appellees/Cross–Appellants on Cross–Appeal at 21. The district court did not err in refusing an instruction that did not address a claim (or defense) of a party.

■ OXY next asserts that the district court erred in failing to instruct the jury that truthful communication is privileged. Because the "proposed" instruction is not part of the record, nor preserved for appeal, we consider only OXY's related claim that the instruction given was improper. The district court instructed the jury that if OXY's interference was made with "honest intent," that interference was justified, and that if OXY had a legitimate economic interest in the subject matter of the contract or if it was seeking to protect its own contract rights, such conduct also was privileged and the verdict should be for OXY. OXY argues that the jury could have been misled into basing liability solely on OXY's alleged motive regardless of the truth of the statements. We conclude that use of the "honest intent" language was sufficient to prevent the jury from

finding tortious interference if it also found that the communication was truthful. The instruction comports with Oklahoma law, which recognizes that allegedly improper interference may be justified, privileged or excused. Speculation that OXY's allegedly improper motive may have driven the jury to find liability without regard to the truthfulness of OXY's statements is not a sufficient basis to conclude the jury instructions were improper.

■ OXY finally asserts the district court should have instructed the jury that performance of a contract is relevant to its interpretation and validity. Because OXY did not preserve this issue for appeal, we review for plain error. *See United States v. Zimmerman*, 943 F.2d 1204, 1213 (10th Cir.1991). The district court instructed the jury that OXY contended that all of its contracts with plaintiffs were valid and binding. The district court also instructed the jury that OXY maintained that the terms of the contract were reflected by the conduct and written agreements of the parties. These instructions are correct statements of the applicable law and not clearly erroneous.

In sum, the jury instructions on tortious interference addressed each element of the claim and framed the issues for the jury. The district court permitted OXY to submit its theory of the case in a contention instruction. The court did not err in the selection of jury instructions because as a whole, they "properly guided the jury in its deliberations." *Mitchell v. Mobil Oil Corp.*, 896 F.2d 463, 468 (10th Cir.), *cert. denied*, 498 U.S. 898, 111 S.Ct. 252, 112 L.Ed.2d 210 (1990).

### III

### *Punitive Damages Award—Jury Instruction Errors*

■ OXY argues that we must reverse and order a new trial because the jury instructions permitted the jury to award punitive damages for breach of contract and contract damages contrary to Oklahoma law. The district court denied OXY's requested jury instructions that (1) under Oklahoma

structions and deny defendants' motion to sup-

plement the record.

law punitive damages must be based on the act that constitutes the cause of action, *see Garland Coal and Mining Co. v. Few*, 267 F.2d 785, 790 (10th Cir.1959), and (2) Oklahoma law prohibits punitive damages for breach of contract. *See Burton v. Juzwik*, 524 P.2d 16, 19–20 (Okla.1974). The court gave the following instruction: "If you find in favor of plaintiffs on their tortious interference with an existing contract claim, their tortious interference with expected contractual business relations claim, or both, then you may award plaintiffs punitive damages." II Appellant's App. 528.

OXY first argues that the instructions permitted the jury to award punitive damages for breach of contract, relying on *Silkwood v. Kerr–McGee Corp.*, 769 F.2d 1451 (10th Cir. 1985), *cert. denied*, 476 U.S. 1104, 106 S.Ct. 1947, 90 L.Ed.2d 356 (1986), in which the jury awarded compensatory damages based on both personal injury and property damage and awarded $10 million in punitive damages. In *Silkwood*, we reversed the compensatory award for the personal injury but upheld the award for property damage. Then, although an award for property damage would have supported a punitive award, we vacated the award and ordered a new trial on punitive damages because we could not determine to what extent the punitive award was based on the property damages that were upheld. *Id.*, 769 F.2d at 1461.

*Silkwood* is distinguishable from the instant case. In proving their tortious interference claim plaintiffs here necessarily had to show that their contracts with OXY were not valid at the time of OXY's tortious conduct; thus plaintiffs presented evidence that OXY had breached those contracts. But even though part of the proof may have been breach of contract, the cause of action here was tortious interference, and the jury was specifically instructed on the tortious inter-

ference claim.[11] The district court correctly instructed the jury on punitive damages.

In a related argument, OXY asserts that the jury instructions erroneously allowed a punitive damage award based in part on contract damages. Our review of the record, however, indicates that any evidence of contract damages was incidental to proving breach of contract.

## IV

### *Punitive Damages—Procedural and Substantive Due Process*

OXY makes a multiprong attack on the punitive damage award. It strenuously argues that the award violated both procedural and substantive due process. We first address OXY's procedural due process argument.

### A

### *Procedural Due Process*

In *Honda Motor Co. v. Oberg*, —— U.S. ——, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994), the Supreme Court noted that its recent opinions "strongly emphasized" the importance of the procedural component of the Due Process Clause. *Id.* at ——, 114 S.Ct. at 2335 (citing *TXO Prod. Corp. v. Alliance Resources Corp.*, —— U.S. ——, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993)) (the award had been reviewed and upheld by the district court and unanimously affirmed on appeal which created a strong presumption of validity); *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 17, 20–21, 111 S.Ct. 1032, 1042–43, 1044–45, 113 L.Ed.2d 1 (1991) (common law method of assessing punitive damages did not violate procedural due process; stressing the availability of both "meaningful and adequate review by the trial court" and subsequent appellate review)). These opinions set out the test for determining whether OXY

11. OXY points out that in reviewing the punitive damages award the district court relied on OXY's alleged failure "to perform material obligations set forth in the contracts, including failure to pay for the gas taken, and improperly charg[ing] a gathering fee ... and fraudulently induc[ing] plaintiffs into entering certain contracts." II Appellant's App. 794. OXY alleges that the district

court failed to recognize that breaches of contract, misconduct and fraud cannot be the basis for punitive damages in Oklahoma. But, the district court concluded that the contract breaches, fraudulent inducement and misconduct were all evidence of OXY's *motive* in the tortious interference claims. *Id.* at 793–94.

received procedural due process on the punitive damages award.

In *Haslip* the Supreme Court considered whether the common law method for assessing punitive damages in Alabama afforded procedural due process. The three-tier common law approach to punitive damages, also employed in Oklahoma, first provides that the jury is instructed on the proper purpose for punitive damages and is told to consider the seriousness of the wrong and the amount needed to deter wrongful conduct. Second, the district court then reviews the jury award for excessiveness. Finally, the appellate court reviews the award. The Supreme Court held that this three-step process comports with due process. *Haslip,* 499 U.S. at 15, 111 S.Ct. at 1041.

█ OXY argues that the procedure in this case did not provide adequate limits on the jury's discretion to award punitive damages as required by *Haslip* and *Honda. See Silkwood,* 769 F.2d at 1461 (10th Cir.1984) (Oklahoma courts provide little guidance to juries in imposing punitives). The jury instructions approved in *Haslip* provided the jury "significant discretion," but also "enlightened the jury as to the punitive damages' nature and purpose, identified the damages as punishment for civil wrongdoing of the kind involved, and explained that their imposition was not compulsory." *Haslip,* 499 U.S. at 19, 111 S.Ct. at 1044. In the instant case the jury was instructed that the purpose of punitive damages was to punish for misconduct and to serve as an example to others to deter them from similar conduct. The jury was advised that any award of punitive damages must be based on "sound reason and calm discretion" and not on the basis of "sympathy, bias or prejudice."[12] II Appellant's App. 529. The jury instructions stated that punitive damages must bear some relationship to both "the injury caused by the offensive conduct" and the conduct itself (but not necessarily to the amount of actual damages awarded). *Id.* These instructions were similar to those approved in *Haslip. See* 499 U.S. at 6, 111 S.Ct. at 1037. Although OXY argues that more guidance should have been

given, the failure to do so was not unconstitutional. *See Glasscock v. Armstrong Cork Co.,* 946 F.2d 1085, 1097 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1778, 118 L.Ed.2d 435 (1992).

OXY also contends that the instruction was improper because the jury was allowed to consider the wealth of the defendant. But the plurality in *TXO* noted that "in *Haslip* we referred to the 'financial position' of the defendant as one factor that could be taken into account in assessing punitive damages." *TXO,* —— U.S. at ——, 113 S.Ct. at 2723 (plurality); *see also Robertson Oil Co., Inc. v. Phillips Petroleum Co.,* 14 F.3d 373, 380 (8th Cir.1993) (allowing a jury to consider defendants' financial worth in deciding whether to award punitive damages is constitutionally permissible), *cert. denied,* —— U.S. ——, 114 S.Ct. 2120, 128 L.Ed.2d 677 (1994). Further, OXY's argument that net worth was the *only* factor the jury was allowed to consider is disingenuous; as we have discussed, the jury was told to weigh various factors.

OXY also asserts that the jury should have been instructed to consider the objective standards in the Oklahoma statute in considering whether to award and the amount of punitive damages. The district court (on post-trial motions) and appellate courts and not the jury review the award against those standards. *See Haslip,* 499 U.S. at 20–22, 111 S.Ct. at 1044–46. The jury was instructed by what was an essential paraphrase of Okla.Stat. tit 23, § 9—the same statutory standard the district court used to "lift the lid" that otherwise would have limited punitives to the amount of the compensatory damages. *See* II Appellant's App. 528–30.

█ The second phase of the common law method for assessing punitive damages is adequate review by the district court. OXY argues that the district court's review here was inadequate in that it should have compared the award in this case with awards in similar cases. The Supreme Court has rejected the notion that a district court must articulate the reasons for upholding a punitive damages award; thus we will not require

---

12. Also, in its general instructions on damages the district court stated that the award must be just and reasonable and based on the evidence. II Appellant's App. 521.

a district court to set out a comparative analysis when reviewing punitive damages. *See TXO,* —— U.S. at ——, 113 S.Ct. at 2724. OXY incorrectly asserts that the district court made no effort to articulate a basis for the award other than wealth. In fact, the district court made an in-depth analysis of the four factors considered in determining the reasonableness of an award of punitive damages under Oklahoma law: (1) cause and extent of plaintiff's injury, (2) harm to society, (3) culpability as evidenced by defendant's profit incentive, and (4) defendant's wealth.[13] II Appellant's App. 791–814.

The district court first considered the reasonableness of the award in light of the cause and extent of plaintiffs' injury. *See Chandler v. Denton,* 741 P.2d 855 (Okla.1987); *Hobbs v. Watkins,* 481 P.2d 746, 754 (Okla.1971). Essentially OXY argues that the harm to the plaintiffs here was not great and that the district court's statements that plaintiffs were deliberately shut-in and their business was almost decimated, were not supported by the evidence. The district court's analysis, however, is supported by the evidence. For example, the record reflects that OXY closed the valves on twelve wells. The district court also relied on OXY's untruthfulness to third parties with whom plaintiffs were attempting to conduct business, and the jury's finding "that OXY's conduct was oppressive, wanton or associated with ill will or spite towards plaintiffs." II Appellant's App. 791.

Second, the district court considered whether the award was justified by the harm caused to society. The district court determined that OXY intended to injure plaintiffs and wrongfully destroy honest competition. The district court concluded that OXY's behavior had a potentially very negative impact on the public, the ultimate consumer of energy resources. OXY takes issue with the district court's statement that "OXY's conduct incrementally damages the United States in its present struggle to remain a global economic power." *Id.* at 797. The district court did not assert that OXY's conduct was largely responsible for our society's economic problems, however, rather it indicated that OXY should be an example to deter others from suppressing free enterprise.[14]

Third, the district court considered OXY's profit incentive, apparently as a subset of defendant's culpability. *See Silkwood,* 769 F.2d at 1466 (Doyle, J., dissenting). OXY attacks the district court's statements that "OXY itself introduced evidence that suggested that its profit incentive was in excess of $4.25 million." II Appellant's App. 797. OXY also challenges the $10 million potential profit figure that the plaintiffs offered and the district court appeared to adopt. *See id.* We agree with OXY that some of these figures appear to be incorrect or misapplied.[15] The district court's analysis of this factor, however, is broader, and acknowledges the *potential* widespread injury to large numbers of independent producers if OXY continued interfering with contracts. Thus, the district court appeared focused on punitive damages as a deterrent to ill-gained profits.

OXY contends that the district court improperly assigned culpability to an OXY official's statement that "if we let this happen with one producer, we could expect for everybody to want to jump right in the middle of us and do the same thing. So we were trying to protect our plant." *Id.* at 799. OXY insists that this was merely a business person trying to protect the corporation's

---

13. OXY in its substantive due process argument attacks the district court's findings on each of these Oklahoma standards. We believe they are more meaningfully reviewed here in the procedural due process portion of the opinion.

14. OXY argues that the district court relied on a misstatement by plaintiffs' counsel that "6000 contracts were affected, involving 100,000 producers," *see* II Appellant's App. 798, but the record contains evidence of 6,000 contracts. *See* VIII Appellant's App. 2705.

15. OXY correctly points out that the actual figure for its profit incentive is half of the $4.25 million because OXY only owned half of the plant. OXY also attacks the district court's statement that "plaintiffs contend that OXY stood to ultimately profit by approximately $10 million from its unlawful conduct" and therefore the punitive award was only three times OXY's profit. The district court also noted that OXY could only directly profit by a factor of 50 percent of that $10 million total because of co-owner WNG's interest. Therefore the punitive damage award was actually six times OXY's potential profit.

contract rights. But the district court was left with the "indelible impression" that OXY was worried about producers getting restless and decided to "get out there and subdue them" so that OXY did not lose control. *Id.* While OXY disputes the characterization of this statement, apparently the jury also agreed. We cannot say from the cold record that this interpretation was inaccurate.

■ Finally, the district court analyzed OXY's wealth. Although OXY acknowledges that the financial condition of a defendant is relevant, *see Rodebush v. Oklahoma Nursing Homes, Ltd.,* 867 P.2d 1241, 1251 (Okla.1993); *Mitchell v. Ford Motor Credit Co.,* 688 P.2d 42, 46 (Okla.1984); *see also Spaeth v. Union Oil Co.,* 710 F.2d 1455, 1460 (10th Cir.1983), *appeal after remand,* 762 F.2d 865 (10th Cir.1985), *cert. denied,* 476 U.S. 1104, 106 S.Ct. 1946, 90 L.Ed.2d 356 (1986), it argues that the jury instruction unfairly singled out wealth and followed an inflammatory closing argument. As we have already discussed, *TXO* indicates that telling the jury that they may consider a corporation's or individual's wealth is not a violation of procedural due process. Further, the jury was also told to consider the type of conduct and the necessary deterrent effect.[16]

■ In addition to looking at these four factors, the district court also reviewed the award for excessiveness. It correctly noted that Oklahoma law does not require the amount of punitive damages to be a particular ratio to the amount of actual damages, *Buzzard v. Farmers Ins. Co.,* 824 P.2d 1105, 1115 (Okla.1991), but instead focuses on the harm defendant's conduct caused or might

potentially cause. *Id.; see also Silkwood,* 769 F.2d at 1460 (although proportionality is not required, there must be some relationship to the injuries actually suffered and to society as a whole). The district court considered the ratio of actual to punitive damages, and also that the award was less than one percent of OXY's net worth.

The district court determined that the punitive damages were appropriate to serve their purposes (citing *Thiry v. Armstrong World Indus.,* 661 P.2d 515, 518 (Okla.1983)). Our review of the record and the district court's order indicates that procedural due process was afforded both in the jury instructions and in the district court's review of the award.[17] *See also Morgan v. Woessner,* 997 F.2d 1244, 1257 (9th Cir.1993), *cert. dismissed,* —— U.S. ——, 114 S.Ct. 671, 126 L.Ed.2d 640 (1994). The final procedural due process safeguard is our substantive review of the amount of the punitive damages award.

## B

### *Substantive Due Process/Excessiveness*

■ We review a punitive damage award to insure that "it does not exceed an amount that will accomplish society's goals of punishment and deterrence." *Haslip,* 499 U.S. at 21, 111 S.Ct. at 1045 (quoting *Green Oil Co. v. Hornsby,* 539 So.2d 218, 222 (Ala. 1989)). We focus on whether the punitive damages are reasonable as to their amount and rational in view of their purpose to punish and deter defendant's conduct. *Id.*

---

**16.** We also note that OXY did not raise a contemporaneous objection to the instruction as to specificity and did not submit a more detailed instruction that it now insists was required. Therefore this objection is waived. *See Rogers v. Northern Rio Arriba Elec. Coop., Inc.,* 580 F.2d 1039, 1042 (10th Cir.1978); *see also* Fed.R.Civ.P. 51.

**17.** OXY also asserts that jury discretion was not adequately limited because in lifting the Oklahoma cap on punitive damages the district court considered conduct other than OXY's alleged tortious interference with contract and potential contract. Thus OXY argues that this statutory safeguard was not available to them. The Oklahoma statute allows the jury to award punitives

above the amount of actual damages only if the district court finds on the record that there is clear and convincing evidence "of conduct evincing a wanton or reckless disregard for the rights of another, oppression, fraud or malice, actual or presumed." Okla.Stat. tit. 23, § 9; *see also Rodebush v. Okla. Nursing Homes, Ltd.,* 867 P.2d 1241, 1246–48 (Okla.1993). Section 9 provides defendants with procedural protection beyond that required by common law. We have reviewed the entire record and while the district court may have supported his lifting of the damages cap with some conduct other than tortious interference, the record supports the action of the judge in lifting the cap based on OXY's conduct.

The evaluation of whether a jury's award of punitive damages was excessive is a matter of federal law, even though the justification for punitive damages is a matter of state law. *Capstick v. Allstate Ins. Co.*, 998 F.2d 810, 819 (10th Cir.1993). In this circuit we have asked whether the award was "so excessive as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial." *Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 703 F.2d 1152, 1168 (10th Cir.1981) (in banc), *cert. denied*, 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983). The Supreme Court in *Haslip* suggested that a "manifestly and grossly excessive" standard does not satisfy due process. *Haslip*, 499 U.S. at 21 n. 10, 111 S.Ct. at 1045 n. 10. Thus, the Fourth Circuit in *Mattison v. Dallas Carrier Corp.*, 947 F.2d 95, 105 (4th Cir.1991), *modified by Johnson v. Hugo's Skateway*, 974 F.2d 1408, 1414 (4th Cir.1992), determined that South Carolina's "excessiveness" standard for reviewing punitive damages did not comport with due process. We believe, however, that our standard satisfies constitutional standards because in determining whether the award meets the excessiveness standard, we also consider the state's substantive factors. *See Capstick*, 998 F.2d at 819 n. 13 (citing *Malandris*, 703 F.2d at 1172–73).

OXY argues that the $30 million punitive damages award can be explained only by passion or prejudice. *See Kelley v. Sears, Roebuck & Co.*, 882 F.2d 453, 459–60 (10th Cir.1989); *Dearmore v. Gold*, 400 F.2d 887, 888 (10th Cir.1968). OXY asserts that plaintiffs' closing argument was inflammatory on the issue of OXY's wealth. Plaintiffs' attorney stated that OXY earned over $36 million a week and urged the jury to "[t]ake away OXY's allowance for a week, that's 36 million dollars." VIII Appellant's App. 2767. Although OXY may be correct that the jury considered the $36 million figure in reaching the $30 million punitive award, we cannot conclude on the record as a whole that the jury acted out of passion or prejudice.

OXY also argues that compared to cases in which innocent people died as a result of egregious corporate conduct, this case, involving purely economic loss, does not call for such a large punitive damage award, citing *Mason v. Texaco, Inc.*, 948 F.2d 1546 (10th Cir.1991) (*Mason II* ) ($25 million punitives remitted to $12.5 million), *cert. denied*, —— U.S. ——, 112 S.Ct. 1941, 118 L.Ed.2d 547 (1992), and *O'Gilvie v. International Playtex, Inc.*, 821 F.2d 1438 (10th Cir.1987) ($10 million punitives upheld in toxic shock death), *cert. denied*, 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 601 (1988). OXY does not cite any cases holding that punitive damages in economic injury cases must be less than those in personal injury cases, and we have found none. We note that recent highly publicized awards against major oil companies Exxon and Texaco involved punitive damages awards of billions of dollars for economic injury.

OXY also argues that the ratio of punitives to compensatory damages, here 111:1, is indicative of an excessive award. OXY relies on *Haslip* for the proposition that the four to one ratio there was "close to the line." 499 U.S. at 23, 111 S.Ct. at 1046. The Supreme Court recently, however, upheld a punitive damages award with a ratio of over 526:1. *TXO*, —— U.S. at ——, 113 S.Ct. at 2721. The Court "eschewed an approach that concentrates entirely on the relationship between actual and punitive damages." *Id.* The *TXO* opinion noted that even if plaintiff's figures were exaggerated, the jury could have believed that there was a multimillion dollar reduction in defendant's royalty payments. Although plaintiffs here may have exaggerated the amount of potential profit to OXY, the record indicates that profit was in the million dollar range. After *TXO*, we cannot conclude that the disparity between actual and punitive damages is controlling. An 111:1 ratio is not necessarily an excessive award, particularly in light of defendant's net worth.

The jury apparently considered the wealth of the defendant, a large oil company with a parent company worth over a billion dollars, in determining the amount needed to punish and deter. *See Haslip*, 499 U.S. at 21, 111 S.Ct. at 1045 (punitive damage award must be reasonable in amount and "rational

in light of [the] purpose to punish what has occurred and to deter its repetition"). OXY cites several cases in which the net worth in 1990 of the defendant companies was greater than OXY's, yet smaller punitive awards were found excessive. *See Mason II*, 948 F.2d 1546 ($9 billion net worth); *Kelley*, 882 F.2d 453 ($12.8 billion net worth—$1.25 million award found excessive); *Spaeth*, 710 F.2d 1455 ($2.5 billion net worth—$3 million award excessive). Of course, the ratio of a defendant's worth to the punitive. damages awarded is not a benchmark of excessiveness. *Cf. Mason II* (a previous jury had declined to award any punitive damages); *Spaeth* (actual damages of . $22,807); *Kelley* (new trial ordered on compensatory damages issue; court noted that Colorado law requires punitive damages to bear some relationship to actual damages, thereby also providing support for new trial on punitive damage issue). More fundamentally, however, we would exceed our scope of review if we required symmetry in the manner OXY suggests.

OXY further contends that the sheer size of the award alone shocks the judicial conscience, and therefore we should order a remittitur. OXY notes that this is the largest punitive damages award in Oklahoma history and is twice the amount of any award upheld in this circuit, citing *Mason II*. The size of an award alone is not enough to establish passion and prejudice. In *Mason II*, a man died of leukemia after using a benzene test kit that contained no warning. The jury awarded his estate and spouse $9,025,000 in actual damages. We determined that the punitive damages award for $25 million was a "staggering sum" that "shock[ed] our judicial conscience" and was "excessive and beyond a reasonable punitive award under the law of Kansas." *Mason II*, 948 F.2d at 1560–61. On its face, *Mason II* appears to support OXY's argument. This court noted that in *Mason II* "it was significant to the panel that in the first trial ... the plaintiff sought punitive damages of only $8 million and the first jury did not award any punitive damages." *Capstick*, 998 F.2d at 820. In *Mason II*, the panel believed the punitive damage award was aberrational.

To be sure $30,000,000 is a strikingly large figure when viewed from the perspective of three judges whose combined incomes in their lifetimes will not come close to that figure. Viewed from the perspective of a successful individual plaintiff (and his lawyer if on a contingent fee) the reward is like winning a lottery because it immediately catapults the plaintiff (and perhaps his lawyer) to a position of great wealth. But examined from the perspective of what is necessary to punish a very wealthy corporation, and to deter it and others similarly situated from like behavior—which we are required to do—$30,000,000 is not necessarily a shocking figure.

Our own review of the voluminous record reveals several factors that support the extremely large punitive damages award. The district court summarized those factors when it found clear and convincing evidence to lift the cap on punitives: (1) OXY withheld payments it owed to plaintiffs to induce plaintiffs to change their position; (2) OXY changed its position on the status of contracts based on a reassessment of their strategic position; (3) OXY employees altered internal documents containing damaging statements; and (4) OXY selectively incorporated charges agreed to in contracts to benefit OXY at plaintiffs' expense. VIII Appellant's App. 2738–39. Further, after the hearing on the motion for new trial or remittitur, the district court noted "that there had been a complete change in the position of [OXY] with respect to the coterminous provisions and whether those contracts retained validity." *Id.*, —— U.S. at ——, 113 S.Ct. at 2762. The district court also observed that the jury was "visibly reactive to" the testimony of OXY's corporate representative that "'we cannot let [plaintiffs] get away with this or everybody else will try to do it [bypass Rodman].' It was a 'the natives are restless, we better get out there and subdue them' kind [of] presentation." *Id.*

The jury heard voluminous evidence that OXY engaged in oppressive and coercive behavior that interfered with plaintiffs' present and prospective contracts; the consequences of such unchecked behavior could be disastrous. The district court properly allowed

the jury to consider the potential harm that might result if defendant's conduct continued unabated. *TXO*, —— U.S. at ——, 113 S.Ct. at 2722. The jury evidently was persuaded that only a very sizeable award would truly punish OXY and deter future tortious conduct. We will not disturb the jury's award.

## V

### *Breach of Contract Counterclaim*

■ OXY asserts that the district court improperly failed to instruct the jury that performance is relevant in the interpretation and validity of contracts. OXY correctly points out that the validity of the contracts between the parties was a central element of its claims. But the jury was charged to consider the conduct of the parties in determining whether or not the contracts were valid; we discern no error and deny OXY a new trial on this claim of error.

## VI

### *Antitrust Claims*

Plaintiffs appeal the district court's grant of summary judgment for OXY and WNG on plaintiffs' antitrust claims, which asserted

that through concerted efforts OXY and [WNG] have jointly controlled the flow of gas and transportation of gas on the Rodman Gathering System by requiring any person who wants to transport gas' on the System to enter into arrangements with OXY for the compression, treating and processing of that gas. OXY provides the only field compression on the System and will not provide compression unless Plaintiffs agree to have their gas processed at the Rodman Plant. When OXY demanded that Plaintiffs continue to have their gas treated and processed at the Rodman Plant as a condition to collecting and transporting over the Rodman Gathering System, Plaintiffs rejected this demand. Thus, Defendants have refused to provide transportation service for Plaintiffs' gas to their customers unless Plaintiffs agree to have their gas·processed by OXY. Plaintiffs allege, in part, illegal tying, conspiracy to restrain trade and conspiracy to monopolize.

I Appellant's App. 257–58 (quoting Order Denying Defendants' Motions for Protective Orders, No. CIV–90–1006–A, at 3–4 (W.D.Okla. Mar. 21, 1991)). Plaintiffs appeal summary judgment only of the Sherman Act § 1 tying claim and the conspiracy to restrain trade claims.

■ We review the entry of summary judgment applying the same legal standard used by the district court under Fed.R.Civ.P. 56(c). *Russillo v. Scarborough*, 935 F.2d 1167, 1170 (10th Cir.1991). "Summary judgment is appropriate when there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." *Id.* We review de novo the district court's conclusions of law, and read the record in the light most favorable to the parties opposing the motion for summary judgment. *See City of Chanute v. Williams Natural Gas Co.*, 955 F.2d 641, 647 (10th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 96, 121 L.Ed.2d 57 (1992). We acknowledge that summary judgment in antitrust cases is generally disfavored, *id.;* however, "allegations of restraint of trade must be supported by significant probative evidence in order to overcome a motion for summary judgment." *Key Fin. Planning Corp. v. ITT Life Ins. Corp.*, 828 F.2d 635, 638 (10th Cir.1987) (quoting *Instructional Sys. Dev. Corp. v. Aetna Casualty & Sur. Co.*, 817 F.2d 639, 644 (10th Cir.1987) (citations omitted).

### A

#### *Tying*

In their § 1 tying claim, plaintiffs alleged that in order to purchase transportation on the Rodman system they were forced to purchase gas processing through OXY's Rodman plant. Plaintiffs specifically asserted that WNG in cooperation with OXY used a nomination procedure to thwart competition. WNG's nomination procedure required a shipper to submit a nomination informing WNG of the amount of gas to be shipped and the location of the receipt and the delivery points. WNG requested confirmation of the nomination from the gas producer and the recipient of the gas. WNG also sought OXY's confirmation of all nominations even

though the tariff contained no such precondition. Plaintiffs alleged that OXY, with WNG's express consent, systematically refused to confirm gas that was not destined for processing at the Rodman plant.

In response, WNG and OXY asserted that although WNG was an open access transporter, the existing system did not allow movement of gas from the Rodman gathering system to WNG's transmission line without going through OXY's Rodman plant. WNG produced evidence that it provided plaintiffs with other options to move gas from the Rodman area to WNG's main transmission line, including arranging with a third party to perform necessary compression and treating of gas, or by installing a gathering compression and treating facility, or by arranging with a third party to use their facility. WNG also informed plaintiffs that there were existing gathering lines and processing plants owned by other companies in the Rodman area that connected either directly or indirectly to WNG's transmission system through which plaintiffs could move their gas to WNG's system and avoid OXY's facilities.

The district court found that "[p]laintiffs cannot prove anticompetitive tying," and also stated "the tying claim fails for the same reason of lack of monopoly power, based on insignificant market strength, that immobilized the monopolization and abuse of monopoly power claims." I Appellant's App. 268–69 (district court order) (citing *Smith Mach. Co. v. Hesston Corp.*, 878 F.2d 1290, 1294–98 (10th Cir.1989), *cert. denied*, 493 U.S. 1073, 110 S.Ct. 1119, 107 L.Ed.2d 1026 (1990)).

"A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product.... Such an arrangement violates § 1 of the Sherman Act if the seller has "appreciable economic power" in the tying product market

and if the arrangement affects a substantial volume of commerce in the tied market.' " *Eastman Kodak Co. v. Image Technical Servs., Inc.*, —— U.S. ——, ——, 112 S.Ct. 2072, 2079, 119 L.Ed.2d 265 (1992) (citing *Fortner Enters., Inc. v. United States Steel Corp.*, 394 U.S. 495, 503, 89 S.Ct. 1252, 1258–59, 22 L.Ed.2d 495 (1969) (internal citation omitted)). Thus there are three elements necessary to a tying claim.

> First, purchases of the tying product must be conditioned upon purchases of a distinct tied product. Second, a seller must possess sufficient power in the tying market to compel acceptance of the tied product.... Finally, a tying arrangement must foreclose to competitors of the tied product a "not insubstantial" volume of commerce.

*Fox Motors, Inc. v. Mazda Distribs. (Gulf), Inc.*, 806 F.2d 953, 957 (10th Cir.1986) (citations omitted). Plaintiffs assert that they demonstrated material issues of fact existed on each of the three tying elements and summary judgment was improper. Because we believe plaintiffs failed to meet their burden on at least one of the three elements, we uphold the grant of summary judgment.

The district court found, *inter alia*, that the tying claim failed on the element of market or economic strength.[18] I Appellant's App. 269. The district court "reject[ed] outright plaintiffs' self-serving assertion that defendants control virtually one hundred percent (100%) of the relevant market, which plaintiffs define as the area consisting of only the low-volume wells requiring long-term contracts, and which is controlled exclusively by the Rodman Gathering System." *Id.* at 261.[19] The district court determined that no reasonable jury could accept that definition; the smallest relevant market would be the four-county area where the gas wells at issue

---

18. In analyzing the monopolization and abuse of monopoly power claim (not appealed here), the district court determined that plaintiffs failed to show significant market strength. The district court used this analysis in its findings on the market strength element of the tying claim.

19. Although plaintiffs originally described the relevant market as the four-county area, they later attempted to redefine the relevant market to

include only a few wells described as low deliverability, low reserve wells that were already connected to the Rodman system with low production so that none of defendants' many competitors were willing to invest the funds necessary to extend a line to them. The district court stated that "plaintiffs are saddled with their Complaint as filed in this Court." I Appellant's App. 269.

are located. The district court also found that a market based on sources of natural gas that are in close proximity to a pipeline is an insufficient market definition as a matter of law. I Appellant's App. at 263 (citing *Carlock v. Pillsbury Co.*, 719 F.Supp. 791, 843 (D.Minn.1989) ("courts have refused to define the relevant market as one encompassing only the defendant's product")); *accord Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 495 (4th Cir.1986) ("A market drawn too tightly ... creates the illusion of market power where none may exist."), *cert. denied*, 481 U.S. 1050, 107 S.Ct. 2182, 95 L.Ed.2d 838 (1987).

The district court noted that the Rodman gathering system and the Rodman plant controlled less than ten percent of the Sooner Trend market. The court acknowledged that control of a small percentage of the relevant market is not considered per se insignificant market strength in this circuit. *Compare Reazin v. Blue Cross and Blue Shield*, 899 F.2d 951, 968 (10th Cir.) ("market share percentages may give rise to presumptions, but will rarely conclusively establish or eliminate market or monopoly power"), *cert. denied*, 497 U.S. 1005, 110 S.Ct. 3241, 111 L.Ed.2d 752 (1990) *and Shoppin' Bag v. Dillon Cos.*, 783 F.2d 159, 162 (10th Cir.1986) (other factors include number and strength of competitors, difficulty in entering the market, consumer sensitivity to price changes, market developments, and multimarketing by defendant) *with Colorado Interstate Gas Co. v. Natural Gas Pipeline of Am.*, 885 F.2d 683, 694 n. 18 (10th Cir.1989) ("Supreme Court has refused to specify a minimum market share necessary to indicate a defendant has monopoly power, [but] lower courts generally require a minimum market share of between 70% and 80%") (dictum), *cert. denied*, 498 U.S. 972, 111 S.Ct. 441, 112 L.Ed.2d 424 (1990). The district court then determined that plaintiffs failed to rebut the presumption that OXY and WNG's relatively insignificant market share did not constitute monopoly power. The court relied on evidence of other relevant factors; for example, that the four-county area was served by sixteen pipelines

and gathering systems and thirteen gas processing plants,[20] and that plaintiffs themselves sold or transported gas in that four-county area through many companies, including Phillips Petroleum, Conoco, Exxon, and Texon. The district court correctly determined that plaintiffs failed to establish defendants had sufficient strength in the relevant market; hence we affirm entry of summary judgment on the tying claim.

### B

#### *Conspiracy to Restrain Trade*

 Plaintiffs also assert that the district court erred in granting summary judgment on the § 1 claim of conspiracy to restrain trade. To recover on the conspiracy claim plaintiffs must establish a contract, conspiracy, or combination to unreasonably restrain trade. *See Tarabishi v. McAlester Regional Hosp.*, 951 F.2d 1558, 1571 (10th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992). Plaintiffs' conspiracy claim essentially duplicates their tying claim, because here the alleged tying required both an agreement between the defendants as well as the fundamental "tied" agreement with the purchaser (plaintiffs). The district court found that plaintiffs did not present direct evidence of a conspiracy. In the absence of such direct evidence, we will not presume that conduct which is arguably consistent with legitimate business activity as well as an illegal conspiracy supports an inference of anticompetitive activity. Instead, the issue becomes whether plaintiffs presented evidence " 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1470–71, 79 L.Ed.2d 775 (1984)). Thus when evidence of conspiracy is ambiguous, we next ask if there is "any evidence that tends to exclude the possibility that the defendants were pursuing [permissible] independent in-

---

**20.** Two miles was the distance that plaintiffs' expert identified as appropriate to measure com- petition.

terests." *Gibson v. Greater Park City Co.*, 818 F.2d 722, 724 (10th Cir.1987). The district court found the inference of conspiracy was unreasonable because if WNG denied plaintiffs' transportation on the Rodman system it would have reduced WNG's profits. We agree and affirm the summary judgment on the conspiracy claim.

## VII

### *Denial of CTR's Motion for Attorney's Fees on OXY's Counterclaim*

■ Plaintiffs next assert that the district court erred in denying their motion for attorney's fees on OXY's counterclaim. Oklahoma law provides that in a contract case "the prevailing party *shall* be allowed a reasonable attorney fee to be set by the court." Okla.Stat. tit. 12, § 936 (emphasis added). Plaintiffs requested attorney's fees, and they included two affidavits with their motion setting forth the hours, rates and total amounts billed by each attorney. Plaintiffs did not include billing statements in their motion and brief, although they did provide those to OXY; plaintiffs assert, however, that the fee request was apportioned among the various claims in the case and that they only requested fees for defense of the counterclaim. Without holding an evidentiary hearing, the district court denied the fee request in its entirety.

■ We review the district court's decision on attorney's fees for abuse of discretion. *See Cobb v. Saturn Land Co.*, 966 F.2d 1334, 1338 (10th Cir.1992); *Southwestern Bell Telephone Co. v. Parker Pest Control, Inc.*, 737 P.2d 1186, 1189 (Okla.1987). The district court denied plaintiffs' fee request because it found that (1) plaintiffs failed to meet their burden of proving that the request was reasonable; (2) the request was "unreasonable," "duplicative," and "excessive," and (3) plaintiffs' counsel engaged in conduct suggesting "bad faith and gross neglect of professional duty." IV Appellees' App. 1312. The district court relied on cases endorsing the reduction of fees because of insufficient documentation. *See Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983); *Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1203 (10th Cir.1986). We agree with plaintiffs that *Hensley* and *Mares* provide authority only for reducing fees and not for a complete denial of fees.

Plaintiffs point to our case of *Hess Oil Virgin Islands Corp. v. UOP, Inc.*, 861 F.2d 1197 (10th Cir.1988), in which the district court held no evidentiary hearing but found that a one-page affidavit was not substantial enough to support a claim for fees. We stated "the plaintiff is entitled to an opportunity to present evidence to support the claim." *Id.* at 1211 (applying Virgin Island law, where attorney's fee award is discretionary, to attorney's fee issue). An evidentiary hearing on the fee application is at least as important here where a reasonable fee award is mandated by statute.

We understand the district court's hesitancy to award attorney's fees if there was a strong likelihood that plaintiffs' counsel included billing generated exclusively by the antitrust claims. But an evidentiary hearing provides a forum for the district court and defendants to resolve these concerns. It also seems an act of greed for plaintiffs to ask for attorney's fees on the counterclaim in view of the recovery they made on their tort claim. But the Oklahoma law speaks in mandatory language. Therefore, we hold that it was an abuse of discretion to deny all attorney's fees without holding an evidentiary hearing allowing plaintiffs to explain their claims. We remand for a determination by the district court of reasonable attorney's fees as required by the Oklahoma statute. It is axiomatic, of course, that "reasonable fees" include only those charges attributable to the contract claims.

Case No. 92–6350 is AFFIRMED. Case No. 92–6384 is AFFIRMED IN PART and REMANDED to the district court for determination of the attorney's fees issue.